## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CINEO GONZALEZ | ) | |
| **Plaintiff,** | ) | |
| v. | ) | Case No.  CV-00-AR-2760-S |
| HOLDER CONSTRUCTION COMPANY. | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES

Defendant, Holder Construction Company ("Holder"), by and through undersigned counsel, answers and raises the following affirmative defenses to Plaintiff's Complaint as follows:

### I. JURISDICTION

1.

Answering Paragraph 1 of the Complaint, Defendant admits only that Plaintiff Cineo Gonzalez ("Gonzalez") seeks to invoke jurisdiction under the statutes enumerated therein; but it is specifically denied that Gonzalez is entitled to take any relief whatsoever from Holder pursuant to such statutes.

2.

Answering Paragraph 2 of the Complaint, Defendant lacks sufficient knowledge to form a belief as to the truth thereof and therefore denies same, demanding strict proof thereof.

## II.  PARTIES

3.

Answering Paragraph 3 of Plaintiff's Complaint, as to the allegation that "Plaintiff is a Mexican-American male and resides in Chilton County, Alabama," Defendant lacks sufficient knowledge to form a belief as to the truth thereof and therefore denies same, demanding strict proof thereof.  All remaining allegations of Paragraph 3 of Plaintiff's Complaint are denied.  To the contrary, it is affirmatively averred that Plaintiff quit his employment with Holder and, as determined by the State of Alabama Department of Industrial Relations, that Plaintiff "*left [his] most recent bona fide work with [Holder] voluntarily and without good cause connected with the work.*"  (See Decision on Unemployment Compensation Claim attached as Exhibit A)(emphasis supplied).

4.

The allegations of Paragraph 4 of the Complaint are admitted.

## III.  CAUSES OF ACTION

5.

The allegations of Paragraph 5 of the Complaint are denied.  Instead, it is affirmatively averred that Plaintiff has admitted the contrary under oath.  Specifically, Plaintiff testified in his unemployment compensation hearing as follows:

A: Mr. Gordon he was saying that we steal the tools from the company so I stated to Mr. Fred [Groome] about the harassment and *he said he would take care of it* and so that's that.

Q: What kind of harassment was that?

A: You mother fucking Mexicans.  You guys are lazy.  And bad language was what it was when we do all the hard work for the company.

2

Q: You're saying Mr. Gordon was making disparaging remarks about Mexicans?

A: Mexicans yeah.

Q: Back when you were hired?

A: When I was hired yeah in December '98.

Q: *And you reported that to management?*

A: *Yeah the superintendent, Fred Groome.*

Q: *He took action and it stopped?*

A: *It stopped yeah.*

(See Transcript of Appeals Hearing, Excerpts, attached as Exhibit B, pp.7-8) (emphasis supplied)

It is further affirmatively averred that the State of Alabama Department of Industrial Relations

determined the contrary, as well, finding that Plaintiff "*complained to the senior project manager*

*of harassment on the job...and the employer took positive immediate action to correct the situation.*"

(See Decision on Unemployment Compensation Claim attached as Exhibit A)(emphasis supplied).

6.

The allegations of Paragraph 6 of the Complaint are denied. Instead, it is affirmatively

averred that Plaintiff has admitted the contrary under oath. Specifically, Plaintiff testified in his

unemployment compensation hearing as follows:

Q: Did you report that to management also?

A: *No I didn't report that....*

(See Transcript of Appeals Hearing, Excerpts, attached as Exhibit B, p.9) (emphasis supplied).

7.

The allegations of Paragraph 7 of the Complaint are denied.

3

8.

Answering the allegations of Paragraph 8 of the Complaint, it is admitted only that on or about July 30, 1999, Plaintiff made a "Formal Complaint," a copy of which was transmitted to Plaintiff on or about August 5, 1999, and that the memorandum of the "Formal Complaint" indicates that "*all parties were satisfied at the conclusion of the meeting.*" (See "Formal Complaint" attached as Exhibit C) .

9.

The allegations of Paragraph 9 of the Complaint are denied. To the contrary, it is affirmatively averred that Plaintiff quit his employment with Holder and, as determined by the State of Alabama Department of Industrial Relations, that Plaintiff "*left [his] most recent bona fide work with [Holder] voluntarily and without good cause connected with the work.*" (See Decision on Unemployment Compensation Claim attached as Exhibit A)(emphasis supplied).

10.

The allegations of Paragraph 10 of the Complaint are denied. To the contrary, it is affirmatively averred that Plaintiff quit his employment with Holder and, as determined by the State of Alabama Department of Industrial Relations, that Plaintiff "*left [his] most recent bona fide work with [Holder] voluntarily and without good cause connected with the work.*" (See Decision on Unemployment Compensation Claim attached as Exhibit A)(emphasis supplied). It is further affirmatively averred that the State of Alabama Department of Industrial Relations determined the contrary, as well, finding that Plaintiff "*complained to the senior project manager of harassment on the job...and the employer took positive immediate action to correct the situation.*" (See Decision on Unemployment Compensation Claim attached as Exhibit A)(emphasis supplied).

4

11.

The allegations of Paragraph 11 of the Complaint are denied.

12.

Each and every allegation of the Complaint not hereinbefore specifically admitted is hereby denied.

## AFFIRMATIVE DEFENSES

13.

The Complaint is subject to dismissal in whole or in part for failure to state a claim upon which relief may be granted.

14.

Plaintiff is barred from any award of punitive damages because Defendant engaged in no acts or omissions which would rise to the level required to sustain an award for punitive damages.

15.

Plaintiff is barred from any award of punitive damages because such an award will violate the substantive and/or procedural safeguards guaranteed to Defendant by the United States and Alabama Constitutions.

16.

Plaintiff's employment relationship was at-will, subject to termination at any time, with or without cause.

17.

Plaintiff's claims are barred to the extent they involve transactions or events, or seek damages for periods outside the applicable statutory limitations period.

5

18.

All claims under Title VII which were not the subject of a timely charge filed with the EEOC pursuant to 42 U.S.C. §2000e-5(e); with respect to which no investigation or conciliation effort has been made by the EEOC; or, which were not made the subject of a timely civil action pursuant to 42 U.S.C. §2000e-5(f)(1), are barred.

19.

Plaintiff's claims for monetary relief in the nature of back pay are barred to the extent that Plaintiff has failed to mitigate his asserted damages.

20.

Defendant is entitled to a set off against Plaintiff's damage claim in the amount which Plaintiff did or could have earned through reasonable efforts. Defendant also is entitled to a set off against Plaintiff's damage claim in amounts paid to or on behalf of Plaintiff by Defendant.

21.

While Defendants expressly deny any wrongdoing on Defendants' part, if Plaintiff's rights were violated, any such violation occurred outside the scope of employment of any responsible individual and without the consent, ratification, or knowledge of Defendants.

22.

Defendants exercised reasonable care to prevent and correct promptly any harassing behavior, in that they had in place an effective remedial program which acts on and resolves complaints of harassment; the Plaintiff failed and refused, unreasonably, to take any timely action under such program, or to avoid harm otherwise.

6

# STATE OF ALABAMA
## DEPARTMENT OF INDUSTRIAL RELATIONS
## UNEMPLOYMENT COMPENSATION AGENCY
### MONTGOMERY, ALABAMA  36130



## DECISION ON UNEMPLOYMENT COMPENSATION CLAIM

**Other Parties:**

FISHER & PHILLIPS LLP
ATTN WALTER J. KRUGER, III
ATTORNEY AT LAW
1500 RESURGENS PLAZA
945 EAST PACES FERRY ROAD
ATLANTA GA  30326-1116

**Other Parties:**

HOLDER CONSTRUCTION CO.
ATTN FRED GROOME
PROJECT SUPERINTENDENT
524 LIBERTY PARKWAY
BIRMINGHAM AL  35242

# THIRD PARTY ATTACHMENT

### CASE NUMBER: 5204-AT-00
### CLAIMANT: CINEO GONZOLEZ

**Please see the attached Decision on Unemployment Compensation Claim.**

/jci



AT-1

**RECEIVED**
JUN 2 2 2000
By_____



**STATE OF ALABAMA**
**DEPARTMENT OF INDUSTRIAL RELATIONS**
**HEARINGS AND APPEALS DIVISION**
**MONTGOMERY, ALABAMA  36130**

## DECISION ON UNEMPLOYMENT COMPENSATION CLAIM

**CLAIMANT**

CINEO GONZOLEZ
PO BOX 143
JEMISON AL  35085-0143

**EMPLOYER**

HOLDER CONSTRUCTION CO
3333 RIVERWOOD PKWY STE 400
ATLANTA GA  30339

| | | | |
|---|---|---|---|
| **APPELLANT** | : CLAIMANT | **DATE MAILED** | : 6/21/00 |
| **LOCATION** | : ALABASTER | **CASE NO.** | : 5204-AT-00 |
| **OC NO.** | : 24-41 | **S. S. NO.** | : 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 |
| | | **HEARING DATE** | : 6/15/00 |

**APPEARANCES AT THE HEARING:** Claimant and employer attorney with witness.

**ISSUE(S):** Voluntarily leaving most recent bona fide work without good cause connected with such work.  Section 25-4-78(2) Code of Alabama 1975

**FINDINGS:** The claimant appealed an Examiner's determination imposing a disqualification and denying benefits under Section 25-4-78(2) of the Unemployment Compensation Law.  The determination was based upon a finding that the claimant left most recent bona fide work with this employer voluntarily and without good cause connected with work.

The claimant last worked for this employer on or about March 23, 2000, as a parking lot security guard and had been employed since 1998.

In 1999, the claimant complained to the senior project manager of harassment on the job from coworkers/supervisors and the employer took positive immediate action to correct the situation.

In January 2000, the claimant was sitting down reading a magazine in a work trailer.  The chair in which he was sitting was situated directly below two shelves where reference binders and books were stored.  The safety director reached above the claimant to the top shelf to pull out a binder and another binder fell and hit the claimant on the head.  The claimant contends that it was intentional but the employer contends that it was an accident.  Subsequently, the claimant injured his knee on the job and was placed on light-duty work in the position of a parking lot security guard.  The claimant was working this position when he walked off the job without notice on the advice of his attorney due to alleged harassment at work because of the claimant's national origin.  The claimant had complained to the manager about the working conditions in the parking lot and they were taking steps to address those complaints when the claimant walked off the job.

**CONCLUSIONS:** Section 25-4-78(2) of the Law requires a disqualification of an individual who voluntarily leaves his most recent bona fide work without good cause connected with such work.  "Good cause" is defined as substantial reason; just ground for such action; adequate excuse that will bear the test of reason; and always the element of good faith.  The evidence indicates that the claimant

walked off the job without notice on his last day of work. At that time, there was an issue involving the claimant allegedly being harassed because of his national origin and the working conditions at the claimant's post as a parking lot security guard. The claimant has failed to carry the burden of proof in establishing through the preponderance of evidence that he had a good work connected cause for leaving employment. Therefore, he is subject to a disqualification under this section of the Law.

**DECISION:** The Examiner's determination is affirmed. The claimant remains disqualified under the provisions of Section 25-4-78(2) of the Unemployment Compensation Law. This disqualification remains in effect until the claimant reenters insured or other acceptable employment as specified in the Law, earns wages in such employment of not less than ten times the weekly benefit amount, and is separated from such employment under nondisqualifying conditions. The maximum amount of benefits to which the claimant may later become entitled is reduced in accordance with the Examiner's determination. The employer's experience rating account is relieved of charges for this period of employment.

**APPEAL RIGHTS:** This decision becomes final unless an application for leave to appeal to the Board of Appeals is received at the Local Claims Office or the Department address above on or before the **FINAL DATE OF July 6, 2000.**

R. T. Mazzone
Appeals Referee


RTM/jci

c: Walter J. Kruger, III
   Atlanta, GA  30326-1116

   Fred Groome
   Birmingham, AL  35242

# STATE OF ALABAMA

## DEPARTMENT OF INDUSTRIAL RELATIONS

### MONTGOMERY, ALABAMA



## TRANSCRIPT OF APPEALS HEARING

**CLAIM OF:**

Cineo Gonzolez
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

| | | |
|---|---|---|
| Hearing Held | : | Thursday |
| Hearing Date | : | June 15, 2000 |
| Location | : | Alabaster |
| Case Number | : | 5204-AT-00 |

**EMPLOYER:**

Holder Construction Company

R. T. Mazzone, Administrative Hearing Officer

### Persons Present

Mr. Cineo Gonzolez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Claimant

Mr. Walter J. Kruger, III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Attorney at Law

Mr. Fred Groome . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Witness

REFEREE:     This is case number 5204-AT-00. Today's date is June 15, 2000. Location, Alabaster Employment Security Office. R. T. Mazzone, Hearing Officer. Claimant, Cineo Gonzolez, is present. Representing the employer in a legal capacity only is Walter J. Kruger, III, Attorney at Law. Accompanying is the company representative and witness, Fred Groome, Project Superintendent. Okay we're here regarding the claim filed by Mr. Gonzolez based upon most recent bona fide work with Holder Construction Company. The Claims Examiner had ruled that he left the job voluntarily without establishing a good work connected cause for doing so under Section 25-4-78(2). He timely appealed that decision so the case was set for hearing this afternoon on his appeal. The issue being considered is under Section 25-4-78(2), whether the claimant left the most recent bona fide work voluntarily without a good work connected cause. All right we'll proceed from the claimant's side first. He has the burden of proof in a voluntary separation. I'll ask you some initial questions to verify your present mailing address, period of employment, last position held, date separated. Then from there you'll give your testimony regarding why you left this employment. If you have any evidence to offer to support it, present it to me at that time. Okay once you've presented your case I'll give the other party's legal representative a chance to ask you questions in the matter. We'll then switch to the other side. Let the company's legal representative question their witness, develop that testimony, and offer evidence to support it. Then I'll give Mr. Gonzolez a chance to question Mr. Groome in the matter. When that's accomplished I'll be ready to adjourn. Each party will have the chance to make a brief overall summary. The party that files the appeal customarily goes last so in this case that will be Mr. Gonzolez in summary. If there's nothing else at that point then I'll end the hearing. Okay do you have any questions now as to how we'll proceed with the hearing or how you'll participate in it?

CLMT:       How is it (UNINTELLIGIBLE) the hearing is going to proceed.  I mean ...

REFEREE:    I just explained it.  What part didn't you understand?

CLMT:       The thing is what do they have to present?  They can present all my evidence.

REFEREE:    You're going to go first and testify.

CLMT:       Okay.

REFEREE:    If you have documents to put in the record and leave with me and you brought copies then you offer them at that time.  When you've finished doing that then I'll turn it over to their legal representative to ask you questions.

CLMT:       I just want to clear that I don't speak English well enough so I may ask the question two or three times till I understand exactly the question.

REFEREE:    Okay.  Are you clear now on how the hearing's going to be conducted?

CLMT:       Yeah.

REFEREE:    Okay.  The Law requires I record the hearing.  I'm doing that now.  It also requires you give your statements under oath if you're here to testify.  So if you're here to testify would you raise your right hands to be sworn.

(INTERESTED PARTIES WERE DULY SWORN)

## EXAMINATION OF CLAIMANT

## QUESTIONS BY REFEREE:

Q.      Mr. Gonzolez is your present mailing address, Post Office Box 143, Jemison, Alabama 35085?

A.      Yes, sir.

Q.      Do you remember what the last day was you were on the job working for Holder Construction Company?

A.      Somewhere ...

Q.      There's a calendar right there.  That's 2000.  That's 1999.

A.      2000.

Q.      This is this year.  That's 2000 if it was this year.

A.      March 13 or 14.  I do not recall the exact date.

Page 3

Q.      Okay. On or about March 13th of this year, 2000?

A.      Yes.

Q.      All right at that time what was your job title with the company?

A.      They called me over viewing the parking lot across the street from the job site.

Q.      Okay.  Did you have a job title?

A.      Yeah, carpenter.

Q.      Carpenter okay.  About when was it that you went to work with the company?  It doesn't have to be the exact date.  About how long was it that you worked there?

A.      Ah, November '98.

Q.      November '98.  All right did you quit your employment with Holder Construction Company?

A.      I had to leave because of a discriminating, harassment, and physical abuse.

Q.      Did you quit your job?

A.      Yes.

Q.      How did you go about quitting, did you send a letter, did you notify somebody in person or did you call them up on the telephone?  How did you go about quitting?

A.      I called my lawyers and I spoke to my lawyers and they said I cannot handle the harassment no more.  I just walk out and I don't have to leave any notice or anything.

Q.      All right you didn't tell your employer that you were coming back at all?

A.      No.

Q.      You just worked one day, finished, and didn't come back?

A.      Yes that's right.

Q.      All right go ahead now and offer your statement and your evidence as to why you quit the job.

A.      I quit because the (UNINTELLIGIBLE) Mr. John Dade, he is the safety director of the company on the job site in Birmingham, Alabama, he tried

to hit me once on the bus. And he said he would get me later. So January the 4th from what I can recall, ah, he hit me on purpose on the back of my head with a binder and at that time he kept harassing me and discriminating me. And I just spoke to Mr. Fred Groome, superintendent for Holder Construction Birmingham, Alabama, I notified him about the ah, situation. He said he will talk to John Dade. The discrimination still keep going and ah, ...

Q.    When was it you talked to Mr. Groome?

A.    Somewhere in January.

Q.    January of this year?

A.    This year yeah.

Q.    Now was that regarding the incident with Mr. Dade?

A.    Mr. Dade yeah. So ah, when he hit me he kept harassing me so I called the police and make a statement because he kept harassing me. And when he noticed he ah, that I made the police report he said you're going to be sorry for that. Since then he kept pointing his finger, his hand like he was holding a gun. He said when I get you and he kept doing that. So I talked to Ken Sellers (sic) about the situation and he said I'll take care of it. That's when I was working on the other side of the street on the parking lot. And he kept pointing the gun that's when I talked to my lawyers.

Q.    He had a gun?

A.    No he point the finger.

Q.    The finger.

A.    Like he was pointing a gun.

Q.    Like a gun?

A.    Like a gun. He said when I get you. So I said enough is enough. I don't want to take no any chances, any chances over him or injuring me or do something to me because on the bus he tried to hit me once then he hit me and then he was pointing a gun at me.

Q.    A gun?

A.     I mean his finger like it was a gun.  And that's when I decide to leave the job because of the hostile environment on the job site.

Q.     The last thing he was doing was pointing his finger like a gun at you and saying I'm going to get you?

A.     Yeah.

Q.     Now when was it that you had to call the police and they investigated this matter?  What date was that?

A.     I got the report.

Q.     Can you tell me what date it was?  It may be up near the top somewhere.

A.     2/2/2000.  February ...

Q.     February 2nd, 2000?

A.     Yeah.

Q.     Was that regarding the binder incident?

A.     After he hit me with the binder he keep harassing me and discriminating a lot and pointing his finger.  That's when I called the police because ah ...

Q.     You didn't call the police on the day he ...

A.     No.

Q.     ... you got hit with the binder?

A.     No.

Q.     All right the police was called on February 2nd?

A.     February 2nd.

Q.     And you worked until on or about March 13th?

A.     March 13th yeah.

Q.     All right.  Does that complete your testimony?

A.     I got a lot more.

Q.     All right go ahead with the rest of your statement then.  What's the rest of your statement?  What else do you have to say?

A.     I present all the evidence of harassment or later on.

Q.     Well this is the time when you present your evidence.  Do you have any more testimony?  What else do you want to tell me about this?

A.        Since I started working with Holder Construction ah, Mr. Gordon (sic), he was the assistant superintendent of the company, he was coming out of the (UNINTELLIGIBLE) side. They were stealing the tools from the company and he was ah, ...

ATTY:     If I could make an objection Mr. Hearing Officer, Mazzone. The witness has just said he's going to start talking about what somebody said soon after he was hired. He was hired in November of '98 according to what he said and he didn't quit until March of this year. I wanted to object on relevance grounds that it wouldn't have anything to do with the quit. And hope that we don't listen to two years worth of things that don't have to do with it.

Q.        Well let me rule on this. I'm going to overrule your objection because anything within the course of the last period of employment is within the scope of the hearing. Since he quit he has the burden of proof to show he quit for good cause. I'll give him the latitude that connects one thing or the other. He's already indicated he's ah, when he did quit he's alleging it's because of harassment ah, on the job and if he's trying to connect that with a pattern of behavior over the course of employment then he's within his bounds to bring that in as a basis for it.

ATTY:     Okay.

Q.        Go ahead with your statement but make sure you connect this to the reason you left when you did.

A.        Yes this one is ...

Q.        It can't be unrelated. Go ahead.

A.        Okay. Mr. Gordon he was saying that we steal the tools from the company so I stated to Mr. Fred about the harassment and he said he would take care of it and so that's that.

Q.        What kind of harassment was that?

A.        You mother fucking Mexicans. You guys are lazy. And bad language was what it was when we do all the hard work for the company.

Q.        You're saying Mr. Gordon was making disparaging remarks about

Mexicans?

A.      Mexicans yeah.

Q.      Back when you were hired?

A.      When I was hired yeah in December '98.

Q.      And you reported that to management?

A.      Yeah the superintendent, Fred Groome.

Q.      He took action and it stopped?

A.      It stopped yeah.

Q.      So that wasn't why you quit at that time then?

A.      No. That's related how that everything started escalating. And I'm taking this one because they don't do enough to start the harassment from the beginning.

Q.      Okay what else happened after that that was related to this same kind of problem that led you to quit?

A.      On 3/99 a person the name, Johnny Stewart, this person he stayed by the gate all the time waiting for us to come in. He said we would have to come in 10 minutes before 7 o'clock. So we come in at 7 o'clock and he was supposed to keep harassing us, telling us lazy Mexicans. You guys are lazy. You need to keep on working harder. Ah, ...

Q.      Did you report that to someone?

A.      Yeah.

Q.      Who?

A.      Fred Groome. Fred Groome. And (UNINTELLIGIBLE) on those days I asked for permission to go to Mexico. So I went to Mexico and came back from Mexico I started working and I asked Johnny Stewart who was in charge of the crew. And I notice that the carpenter they were making more hours than where I worked. I asked Mr. Stewart why I was not getting more hours. Why I was not treated right. Why I was treated different than the other carpenters. He said if you don't like it just find yourself another job. And so that's when I went to the office and talked to Fred Groome.

Page 8

(UNINTELLIGIBLE) He said we'll take care of it. And he said that's the way he is. He is old. Don't worry about it. I said okay. So that's that too. And I appreciated Mr. Fred. I mean he do the most he can because he really wanted to stop the harassment. This cartoon right here that's ah, ah, from Jonathon Sprite.

Q.    You're showing me a color illustration in a kind of cartoon character format and at the bottom it says "Texan Firing Squad" and has a lewd picture of a naked man with a sombrero on, a gun pointed at him, a various apparatus here, and ah, with a partially naked female facing him is that right?

A.    Yes. He said ... I was at the office at that time he gave me the cartoon. He said this is you mother fucker.

Q.    Who gave that to you?

A.    Jonathon Sprite.

Q.    When did he give it to you?

A.    Around 1/99. January '99.

Q.    January '99?

A.    Yes. Somewhere in those days.

Q.    Do you want to look at his illustration there? Did you report that to management also?

A.    No I didn't report that cause I was ah, complaining too much to management and they do anything to stop him. I called the main office in Atlanta, Georgia, to make a formal complaint. Before I make a formal complaint with the company that's a copy of the formal complaint. That's all they give me.

Q.    Do you want me to keep this or is this yours?

A.    That's mine.

Q.    Okay. I'll pass it around then.

A.    It's a copy on my files.

Q.    Not in this file there isn't.

A.    No.

Q.      If you want me to keep a copy you need to bring a copy with you to the hearing.  I won't keep the original unless you want me to keep it.  Do you want me to keep the picture too, I'll keep both of those?

A.      You got a copy of the picture.

Q.      Well I don't have a copy in the file.  There's a note in here that you attached some things to your appeals statement that were sexually explicit and they didn't attach them.  Just a note that I could get them from the office manager.  What did you attach to your appeal?  What documents when you filed your claim?

A.      I give it to one of them. ... ... .

Q.      What documents were they?

A.      That one right there.

Q.      And what else?

A.      And the picture.

Q.      Is that it?

A.      The incident report.  The police report.

Q.      Now I have some of those in here.  When we get to them.  I don't have this Holder Construction company complaint.

A.      That's (UNINTELLIGIBLE) because I received a letter saying ...

Q.      Okay anything you attach to the letter of appeal that we have a copy of I'll use.  But I won't make a bunch of copies of all the documents you have in your pile there unless you want to leave me the original and I keep it.  But I don't have time to go through and copy everything you have in that stack of papers there to put in the file.

A.      The copies are ... I'm pretty sure you have a copy.

Q.      What I have in here I'll use.  Or what you attached to your appeal statement I'll use.  But anything else I won't copy.  I'm not required to make copies of your documents but if you want to give me the original I'll take it.

A.      Can I come later and get a copy of it?

Q.      No.  No. The only thing I can consider and take is what's available here at

the hearing. I don't see this document here in this. If this was a part of the document you attached to your letter of appeal statement I'll see if the claims office has a copy and use it. But if I don't have a copy of this either you can give me your original or we'll let you just keep this and we'll just pass it around and look at it.

A.       Pass it around.

Q.       All right. This is a Holder Construction Company form for Cineo Gonzolez dated 8/5/99. It's a formal complaint. It's checked, signed by Mr. Sellers. At the bottom by Cineo Gonzolez 8/5/99. Do you want to examine that?

ATTY:   Thank you sir.

A.       Yeah I brought that to because I read on that report right there Mr. Chris, I believe he's the branch manager, he said he was not aware of any ah, initial discrimination or anything that was happening on the company. And I can prove that I did make any statements several statements.

Q.       Okay this just tells us a formal complaint. What was the formal complaint about?

A.       On discrimination and harassment. I asked them to give me a specific, a specific, notice or letter about what I want to say and they said that they don't want to get those papers all the way to the ...

(CHANGING OF TAPE)

REFEREE:  Continuation of case number 5204-AT-00. We went off the record to reverse the cassette. At the time we were just showing the other party one of the documents the claimant's produced regarding a formal complaint to the company on August 5th of '99. Did anything happen while we were off the record? Did anything occur?

ATTY:   No, sir.

WITNESS:  This appears to be an official transmittal that was attached to the formal complaint. He signed it at the bottom. And Beth Sellers, our office processor, also signed that. I don't know exactly what was attached to it. Evidently was represented right here.

Page 11

**CONTINUED EXAMINATION OF CLAIMANT**

**QUESTIONS BY REFEREE:**

Q.      It says one copy of a formal complaint.  Okay what else?

A.      When I was at the trailer I was using the phone just making calls and Chris he told me not to use the phone. And I asked why you not want me to use the phone, everybody's using the phone, he said I don't want you to use the phone.  And I said this applies to me only.  And he said no it don't apply to you. I said well you just telling me.  He said well that's on the rules.  I got the rules right here of the company and it don't specify anything about me using the phone on the office.

Q.      Okay let's see here. The rules, have you presented a copy of the rules before?

A.      No.

Q.      Okay do you have a copy to give me?

A.      That's the only one I got.

Q.      Well then you can just read it in the record or we'll pass it around.  But if you can't give me a copy I can't keep it.

A.      It just says right here there is any records about Chris, the employee manager, saying that it was on the policies for me not to be using the phone.

Q.      Is that the general policies of the company?

A.      Well ...

Q.      What's the title of that document?

A.      Yeah it's Holder Corporation substance abuse, it shows alcohol testing policy, policies and statements.

Q.      It's just the drug, alcohol and ...

A.      It's what you can do, what you cannot do.

Q.      Okay so you're saying this policy wasn't in that rule?

A.      Wasn't in the rule yeah.  And I got ... After I told he to give me a paper where it says I cannot use the phone.  In a couple of minutes he come out with this letter saying that it's to all the employees.

Page 12

Q.        Now I think I have a copy of that document in the file.  Is that a copy of the
          same document?

A.        Yeah that's the same.

Q.        I'll use my copy and give you that back.

A.        Thank you.

Q.        Mark this as Claimant Exhibit A.  It's a copy of a one page memo on Holder
          Company stationary to all job site employees from Chris Eastman, senior
          project manager. It appears to have his initials.  Regarding Federal Reserve
          Bank of Atlanta, Birmingham branch.  Wednesday, February 2nd, 2000.
          Okay pass that to you for your examination, comment, rebuttal or objection.

ATTY:     Thank you.

(MOMENTARY PAUSE - LOOKING OVER DOCUMENT)

ATTY:     That's fine Your Honor.

Q.        I'll keep this one for my copy.  Okay what else?

A.        (UNINTELLIGIBLE)

Q.        Let me see what document you turned in with your letter of appeal.  If it's
          the one you've already mentioned we'll use those copies.  Is that your
          hearing notice?

(MOMENTARY PAUSE)

Q.        This is the only thing the claims office says they retained from the appeal
          form that was ah, attached.  The only two things are the copies of the same
          illustration cartoon that you already showed me.  I'll use one of these copies
          as my copy since you didn't have yours.  It'll be Claimant Exhibit B.  It's a
          one page document and as I previously illustrated two individuals in the
          picture, male and female, both partially or almost totally nude.  Do you want
          to examine that as an exhibit for comment, rebuttal or objection?

ATTY:     No objection.

A.        Can I say something?

Q.        Just a second.  That's all they said was attached to your appeal that they kept
          out of the file because of the explicit content of the cartoon.

Page 13

A.          Can I say one more thing?

Q.          What else?

A.          It's about my time.  I was getting shorted all the time.  Ah, ten, fifteen, twenty minutes on my check.  And I, Jonathan, Jonathan Sprite was the one who was in charge of the payroll.  I asked him why I was getting shorted on my payroll and he told me that he has a watch on his desk where I can put my watch to the same time because I may be leaving early with my time on my watch.  So I said okay I'm going to set my watch with your watch on your desk.  So ah, that same day it was like 15 minutes before 3:30 for me to go home.  He came out of the office and he moved the clock back 15 minutes and I asked him why did you move the time back.  And he said I can move the watch.  How many times I want to and the way I want too how many times I change my watch I always going to be late.  He just don't say anything.

Q.          So when was that?

A.          That was '99 to 2000.

Q.          What month in 2000?

A.          February, I cannot recall exactly the date.  Somewhere in January.  I got a tape where I talked to Fred Groome about the time and he said he will make the arrangements for me.  He was going to put a paper on the wall where nobody can miss with the hours. And so they make a paper for me to sign in and sign out every day like the situation don't happen again.

Q.          Where's your tape?  What tape are you talking about?

A.          It's right here.

Q.          Okay those are small micro cassettes.

A.          Micro cassettes.

Q.          Did you bring a recorder to play that with?

A.          No.

Q.          Then there's no way to hear it.  This recorder here is for the purpose recording the hearing.  As a matter of fact even if I wanted to play those

cassettes on this they're not the same size. And I have to keep this running so it will record the hearing. So if you had any tapes you wanted to play you'd have to bring a recording unit with you to play them.

A.       I don't have one.

Q.       All right then we can't do anything with your tapes. Let me look back in the file on these other documents you said you turned in here that I have in the file, might have a copy of. I think you mentioned a police report.

A.       Yeah I got a police report.

Q.       I have a copy of a police report. Is that the police report front and back that you're referring too?

A.       Yeah.

Q.       I'll use my copy since you didn't bring your own. We'll call this Claimant Exhibit C. It's a one page Birmingham police incident/offense report, front and back, dated 2/2/2000, and the victim is Cineo Gonzolez. The reporting officer is ah, M. Parnell, ID number 2323. Okay. Do you want to examine that for your comment, rebuttal or objection?

ATTY:   Thank you sir. That's fine.

Q.       All right what other document did you have there? I only have really one other one here that's pertinent to this. It's a charge of discrimination form.

A.       Discrimination.

Q.       Is this a copy of the same form you're showing me?

A.       Yeah.

Q.       I'll use my copy. Claimant Exhibit D. It's a copy of a one page from, front only. It's an EEOC form five. Charge of discrimination. Name is Cineo C. Gonzolez. It's dated 3/14/2000. Has his signature at the bottom. The charge is discrimination based upon national origin. I'll let you examine that for your comment, rebuttal or objection.

ATTY:   Thank you sir.

A.       I got here where Mr. Chris, project manager, saying I was able to perform my job on the company. I got proof ...

| | |
|---|---|
| Q. | There's no issue here regarding your ability to work.  There's been no determination denying you benefits on your ability to work. |
| A. | I was just because that is ... |
| Q. | Do you have your hearing notice with you, the one I just passed you back that you had on the desk a moment ago?  Do you have that paperwork?  There was a notice right here I gave you back.  It was your notice.  The next one.  That's your hearing notice.  See the issue at the bottom.  That issue doesn't involve ability to work, availability for work.   You weren't disqualified based on that reason so that's not part of this hearing. |
| A. | Oh, okay.  I was just making because the statement ... |
| Q. | Well but I'm not here for you just to make statements about everything that occurred on your claim, only those related to the disqualification that you appealed. |
| A. | Oh, okay. |
| Q. | The disqualification appealed had nothing to do with ability to work. It had to do with the reason why you quit the job.  Did you quit because of health reasons? |
| A. | No. |
| Q. | Then we don't need to go in to that.  All right.  Have you covered all the information regarding why you quit now? |
| A. | Yes. |
| Q. | We've gone over your documents.  Have you covered those? |
| A. | Yeah. |
| REFEREE: | All right.  Let's see Mr. Kruger you can direct questions of Mr. Gonzolez now regarding the matter of his quitting the company. |
| ATTY: | Thank you sir, Mr. Mazzone.  And I want to say on the record as I mentioned when I first met you that I'm a lawyer from Georgia, from Atlanta, and Holder Construction is actually based on Atlanta.  And I appreciate your letting me be here with them today. |
| REFEREE: | All right. |

ATTY:          So I'll proceed now.

**EXAMINATION OF CLAIMANT**

**QUESTIONS BY ATTORNEY:**

Q.      Mr. Gonzolez ah, you said the last day you worked was March 13, if I told you that it was March 17 would you disagree with that?

A.      No I cannot recall exactly the date.

Q.      That's fine.  You said before you decided to not come back to work you had talked with your lawyers about that?

A.      Yes.

Q.      And that based on everything you decided to just walk out and not to call back is that what you said?

A.      Yes, sir.

Q.      And that's what you did as far as quitting work at Holder?

A.      Yeah I walked off the job.

Q.      You walked off the job?

A.      Off the job yeah because of the discrimination and harassment.

Q.      And after the last day that you worked you  never called them back?

A.      I called once and it was Friday.  I called.  I talked to Beth Sellers.

Q.      You told her I'm not coming back?

A.      No I spoke to her if she can please send my check in the mail and I appreciate it.  So I received my check a couple of days later in the mail.  That's the last time I talked to the company.

Q.      Okay.  From that communication with Beth did you make it clear to her that you weren't coming back to work?

A.      I don't discuss anything with her.

Q.      Okay.  All right.  Now you testified I believe that John Dade intentionally hit you in the back of the head with a binder, is that what you said?

A.      Exactly.

Q.      Can you describe ... Well let me first ask you when did that occur?  Was that January of 2000?

Q.         Okay.  And I just really don't understand.  Is there anything else you have to say about why you want to claim that this safety supervisor intentionally hit you rather than the truth of what is on this document that says the binder accidentally fell off and hit you in the head?

A.         Well he tried to hit me once before and he said he will get me later.  Before that incident happened we were having an agreement.

Q.         Let me ask you this Mr. Gonzolez.  I'm going to show you this picture.  I'm going to just hand it to the Officer and let him look at it and hand it to you.

REFEREE:   Is this something you're going to leave with me as an exhibit?

Q.         No, sir.

REFEREE:   Let's pass it around and look at it.  It's a three by four inch possibly color picture of a desk with a chair and a crude kind of bookshelf with four binders and it looks like a can of aerosol spray and maybe some hand lotion bottle and some other books on it.  Do you want to look at that and make any comment about it?

Q.         Mr. Gonzolez is that where you were sitting?

A.         Yeah this is where I was sitting.  The bookshelf where the binder was it was removed.  It's not shown in this picture.

Q.         That's not the bookshelf?

A.         No there is none.

REFEREE:   Where was the bookshelf?

A.         On top of this one.

REFEREE:   Above that?

A.         Above.

Q.         Okay so you said there were two bookshelves ...

A.         If you can go you can see the marks where the nails were.

Q.         Okay.  Let me ask you ...

A.         There was another bookshelf.

Q.         And so you were seated in this chair?

A.         Yeah I was in the chair.

Q.          And Mr. Dade was trying to get a book from either this shelf which you say no, or the next shelf above it?

A.          The shelf above.

Q.          Okay. Now you could have moved out of his way I guess.

A.          He can ask me (UNINTELLIGIBLE)

Q.          But he didn't ask you to move?

A.          No.

Q.          And you didn't offer to move?

A.          I was like I said we were arguing when he just reached behind me and that's when I felt the binder on my head.

Q.          Okay. Now Mr. Dade told me this morning that this is the binder that fell on your head. Do you agree with that?

A.          No it is not.

Q.          It's not. You think it was a binder that was twice this thick?

A.          Twice.

Q.          Okay.

REFEREE:    You're showing us a white, about one or two inch binder.

Q.          Yes, sir.

REFEREE:    Entitled updates OSHA?

Q.          Yes, sir. Sir even though Mr. Dade told me this morning this is the one, you say it was one that was a little thicker than this right?

A.          Yeah it was thicker than that.

Q.          Okay.

A.          And it was had more papers.

Q.          And you don't know whether or not it fell or not do you because you didn't see it?

A.          He was ...

REFEREE:    It did fall. Something fell.

Q.          Something fell. You don't know whether something fell or whether you were intentionally struck or something do you?

A.  John Dade it says right here he pulled (UNINTELLIGIBLE) of the shelf ...

Q.  Read that whole thing out loud.

A.  John Dade pulled a large binder off the shelf and a small one inch binder fell off the shelf and hit Cineo on top of his head.

Q.  Okay. Do you understand that what that means is he pulled one binder off and another one fell?

A.  That's what he is stating yes. I mean I don't make any statements to him.

Q.  Okay. And you weren't looking at the shelf to see what happened were you?

A.  No.

Q.  Okay. So when a binder, either this one or one that was thicker than this one, fell from that shelf or came down and hit you on the head, that made everything go black?

A.  Somebody (UNINTELLIGIBLE) I see everything black. I almost fell. I was sitting away from the bookshelf. Everything went black and I went down. That's when I started recuperating and I asked Mr. John Dade there was nothing to do. I need to go to the clinic and he said just wait a couple of minutes you don't need to go to the clinic right now.

Q.  Yes and then what?

A.  Then I asked John Dade several times to send me to the clinic that's when he said okay go to the clinic. They don't offer me to go to the clinic or they were going to take me because I was dizzy so I can actually get injured on the road or anything. They don't offer anything.

Q.  Okay this Exhibit C is the police report that you filed?

REFEREE:  You need to show it to him.

Q.  I'm sorry yeah. This is the Exhibit C that the Hearing Officer marked a little while earlier and isn't that a copy of the police report that you filed about this incident?

A.  Yeah.

Q.  Okay. And you spoke with a police officer about this?

Page 24

A.      About the incident yeah.

Q.      All right.  And you told the officer that Mr. Dade had assaulted you?

A.      Yeah.

Q.      Okay and that's the word it says right here, assaulted.

A.      Assaulted.

Q.      All right.  And um, whose writing is this on the back?  Is that yours or the police officers?

A.      The police officer.

Q.      But you signed it right?

A.      Yeah.

Q.      Okay.  Now I'm going to just read what he wrote.  Victim stated that on the date and time listed he was sitting in a work trailer reading a magazine. Were you reading a magazine?

A.      Yeah.

Q.      Say it again.

A.      Yeah.

Q.      Okay.  You hadn't told us that earlier today.  You told us you were arguing.

A.      You don't ask me.

Q.      But you were sitting there in that chair reading a magazine?

A.      Yeah.  I was sitting right there reading a magazine.

Q.      Okay.  And then the report says whom victim had a disagreement with earlier.  So that's what you told the police officer at the time?

A.      Yeah.

Q.      So you weren't arguing right before this happened, you had argued earlier right?

A.      Earlier means before that incident.

Q.      But right at the time that the binder struck you, you were just reading a magazine.  You weren't arguing then were you?

A.      Not at the right moment.

Q.      Okay.

A.          We were having an argument before that happened.

Q.          All right.  And then it says when suspect pulled a three our four pound binder down on victim's head, victim stated he started having headaches and suspect, who was also the safety coordinator for the job site, told victim to go to the hospital.  So he told you to go to the hospital if you wanted to?

A.          Yeah after I asked several times.

Q.          All right.  So what the police officer wrote on this report is true is it not?

A.          Yeah.  Say what the last words on the police report about he tried to hit me on the bus.

Q.          Okay yes.  Advised of warrant procedures and something.  And then it says victim also stated suspect attempted to hit him in October of '99.

A.          Yeah.

Q.          Okay.  So that's the date that you claim he tried to hit you once before?

A.          Yeah.

Q.          But at the day when the binder somehow hit you coming down from the shelf, you were just sitting there reading a magazine?

A.          We were having an argument before he hit me.

Q.          No you were reading a magazine when he hit you.

REFEREE:    He's asking is at the moment the item hit you, at that moment what were you doing?

A.          I was magazine reading.

REFEREE:    That's what he's saying.

Q.          Okay thanks.  Um, now let's see this was in March right?  No this was in January when that binder hit you on the head?

A.          Uh, huh.

Q.          And ah, you still claim to have headaches today from that notebook hitting you on the head?

A.          Yeah.

Q.          Okay.

A.          I have injections in the back of my head to relieve the pain.

Q.     Okay.  All right ah, did you miss any job, any time from work after the binder hit you on the head, because of the binder hitting you on the head?

A.     No.

Q.     So you were still able to work?

A.     They ah, yeah the next day I come back to work because the adjuster from the company, insurance company said if something happen after my injury it was not going to be related because John Dade hit me I got him on tape. I got him on tape because I cannot prove it right now.

Q.     I just want to know after the binder hit you on the head you were able to work right up until the time you walked off the job right?

A.     I don't recall.  I guess I was off a couple of days.  The insurance company sent me a check and everything.  I don't remember exactly how many days.

Q.     All right you testified about a couple of other things.  You said that a Mr. Gordon had said something about Mexicans or something about people stealing from the company?

A.     Yeah.

Q.     But you said you complained about that to Fred Groome and he took care of it and stopped it?

A.     Yeah.  I appreciate it yeah.

Q.     Okay.  And then you said that Johnny Stewart had ah, was checking people in at the gate to make sure they weren't late right?

A.     Uh, huh.

Q.     And that he made a comment that you found derogatory, but you also complained to Fred Groome about that and he saw that that stopped as well right?

A.     He make a comment that's the way he works.  That's the way he is because is old and that's the way he treats people.

Q.     You testified, I wrote it down, you said that stopped too.  That stopped as well didn't it?

A.     It stopped yeah.

Q.          Okay.  In fact Johnny Stewart got transferred away from that job site in about August of '99 didn't he?

A.          I don't recall.  I know he left.

Q.          He wasn't even there for about six months before you quit was he?

A.          Yeah.

Q.          That's correct?

A.          Yeah.

Q.          Okay.  Um, now you introduced this cartoon into evidence that is Exhibit B right?

A.          Right.

Q.          You said that John Sprite gave you this.

A.          Jonathan Sprite.

Q.          Jonathan Sprite you said that he gave you that?

A.          Yeah.  He said ... I was sitting on the same chair ...

Q.          In the picture.

A.          He come out and say that's you mother fucker just like that.

Q.          But ... And that was all that he said?

A.          Yes, sir.

Q.          Okay.  And you took the cartoon from him?

A.          He gave it to me.

Q.          Yeah I'm just saying so you picked it up and kept it?

A.          Yeah.

Q.          Okay.  Um, and did you say that was in January of '99 I think?

A.          Somewhere.  I cannot recall exactly.

Q.          Okay.

A.          Excuse me (UNINTELLIGIBLE) ...

REFEREE:    What do you want to do?  Do you want to recess a moment?

A.          Yeah please.

REFEREE:    Okay do you need medical attention or do you want to get a drink of water or go to the restroom?

A.          Water.

REFEREE:    All right let's recess a moment. Okay we're back on record. Case number
            5204-AT-00. We went off the record to recess for about five minutes or
            less. Mr. Gonzolez was feeling a little dizzy. And you're ready to continue
            is that correct?

CLMT:       Yes that's correct.

REFEREE:    Okay go ahead.

**CONTINUED EXAMINATION OF CLAIMANT**

**QUESTIONS BY ATTORNEY:**

Q.          Thank you sir. Now we were talking about this cartoon Exhibit B. Ah, and
            you said that after Mr. Sprite put it on the desk you picked it up and kept it
            right?

A.          Yeah.

Q.          You testified earlier that you never reported that to anybody in management
            at Holder is that correct?

A.          That's correct.

Q.          Okay. You understand that if you don't report an incident like that that the
            company can't know about it or do anything about it, do you understand
            that?

A.          I don't understand that.

Q.          Well what I want to ask you is how could you expect the company to do
            anything about that cartoon if you never told them about it?

A.          I told it about a week later. No I don't tell them right away, Mr. Fred
            Groome about it. I never showed him the cartoon, about the cartoon and
            Jonathan gave it to me because of the harassment was still going when he
            give me that cartoon.

Q.          So you said earlier that you did not complain about it are you changing that?

A.          No I said that I never gave that to the company, to the company. I never
            gave it to the company but I mentioned it.

Q.          You never gave the cartoon to the company?

That's part of his own personal notes.

Q.     Okay. All right. Let me see what else. Okay now you said that ah, Chris had told you to not make phone calls from the trailer right?

A.     Yeah.

Q.     Chris's name is Eastman?

A.     (UNINTELLIGIBLE)

Q.     You don't know?

A.     I know his name. His name is Chris.

Q.     Chris is a boss, a superintendent out there?

A.     I believe he's the project manager.

Q.     Okay. And you were making phone calls from the, the project trailer out there?

A.     Yeah.

Q.     And the project trailer is where all the construction managers stay as they oversee the building being built?

A.     Yeah.

Q.     All right. And you were making calls for the project for the company?

A.     No I was calling my house, checking my wife.

Q.     Oh, you were making personal phone calls?

A.     Yeah.

Q.     Okay and this is while you were on the clock on company time?

A.     I was sitting right there next to the phone and I asked Fred Groome if I can use the phone once in a while and he said that's fine.

Q.     Okay. But at some point you were using the phone so much till Chris told you to stop wasn't you?

A.     I was not using it all the time. (UNINTELLIGIBLE) He got mad because I make the police report against John Dade.

Q.     That's why you think that happened?

A.     Yeah.

Q.     But you turned in a memo didn't you ...

That's part of his own personal notes.

Q.    Okay. All right. Let me see what else. Okay now you said that ah, Chris had told you to not make phone calls from the trailer right?

A.    Yeah.

Q.    Chris's name is Eastman?

A.    (UNINTELLIGIBLE)

Q.    You don't know?

A.    I know his name. His name is Chris.

Q.    Chris is a boss, a superintendent out there?

A.    I believe he's the project manager.

Q.    Okay. And you were making phone calls from the, the project trailer out there?

A.    Yeah.

Q.    And the project trailer is where all the construction managers stay as they oversee the building being built?

A.    Yeah.

Q.    All right. And you were making calls for the project for the company?

A.    No I was calling my house, checking my wife.

Q.    Oh, you were making personal phone calls?

A.    Yeah.

Q.    Okay and this is while you were on the clock on company time?

A.    I was sitting right there next to the phone and I asked Fred Groome if I can use the phone once in a while and he said that's fine.

Q.    Okay. But at some point you were using the phone so much till Chris told you to stop wasn't you?

A.    I was not using it all the time. (UNINTELLIGIBLE) He got mad because I make the police report against John Dade.

Q.    That's why you think that happened?

A.    Yeah.

Q.    But you turned in a memo didn't you ...

A.      Yeah.

Q.      ... about the telephones?

A.      Yeah.

Q.      And it's dated in February of 2000?

A.      Yeah.

Q.      And it's your Exhibit A is that right?

A.      Yeah.

Q.      Okay.  And it doesn't mention you at all does it?  It says to all employees right?

A.      Yeah.  I got the tape right here when he told me ...

Q.      I don't want to hear what's on the tape.

A.      Okay he told me he said not use the phone anymore.  And I asked him why. And I ask him does this apply only to me.  He said no it don't apply to you. I said well the rest of you are using the phone why you don't tell them anything. He said are you asking can you please give me a paper, a letter or something where it says I cannot use the phone.

Q.      Okay.

A.      That's when he gave me that.

Q.      And this says it applies to all job site employees?

A.      Yeah.

Q.      Okay.

A.      And he said that was on the policy.

Q.      Okay.

A.      And it don't show it on the policy.

Q.      What if he's the manager and he writes a memo to all employees that is the policy isn't it?

A.      Uh, huh.

Q.      Okay.  So you weren't being singled out there.  That applied to everybody is that right?

A.      No he has told me to me.  He told me when we having a meeting every

week I believe, having a meeting when rules and regulations are told and there's a board outside where all the rules and regulations have to be posted for employees to see.

Q.      Yes.

A.      There was not any notices about the phone.

Q.      Let me ...

A.      It just applied to me.

Q.      But it doesn't just apply to you.  It says to all employees right?

A.      That's what he said after.

REFEREE:      What he's saying the verbal conversation at that time was applying only to him then the memo came out applying to everybody.

Q.      Okay.  That's fine.

A.      Thank you.

Q.      Is that right?

A.      Yeah that's right.

Q.      I was missing that.

A.      It's like I said I'm having a hard time talking with him because I don't have translate.

Q.      Well when the policy was written like that that was very soon after he talked to you?

A.      Just a couple minutes.  Just a couple minutes.

Q.      Okay.  That's fine.  All right now I believe that you and I have talked about all the so called or alleged harassment that you've testified about today haven't we?

A.      I think so.

Q.      So this is all that you have to say as far as harassment supposedly being against you right?

A.      Harassment, discrimination.

Q.      Um, the truth is that the company tried very hard to keep you in a job and working didn't it?

A.        I was working yeah.

Q.        And the company ...

A.        I was making $16 an hour and right now I don't have any income. (UNINTELLIGIBLE) $16 an hour job.  I want to keep the job.  I leave because my life was in danger.  My life was mistreated wrong.  That's why I left the company not because I just want too.  I mean I was making good money.

REFEREE:  You're not answering his question.

A.        I'm sorry.

REFEREE:  His question was did the company try to retain you as an employee.  That's what his question was.  Did the company try to keep you as an employee?

A.        Not for the harassment.

Q.        Well am I understanding correctly that every time you complained to Fred Groome about alleged harassment he did something about it and it stopped right?

A.        He tried.

Q.        And it stopped isn't that what you testified?

A.        The first couple of times yeah.

Q.        Okay.

A.        And later no.  He don't do anything.

Q.        The job that you were doing at the time that you quit was guarding the parking lot right?

A.        Yeah.

Q.        Although you testified at the beginning of the hearing that your job title was carpenter right?

A.        Carpenter yeah.

Q.        All right.  Now guarding the parking lot is not a normal job for a carpenter to do is it?

A.        No.

Q.        It's a light duty job isn't it?  To try to give you work to do and keep you

|  | employed, isn't that the reason they gave you that job? |
|---|---|
| A. | Yeah. He said the first time they give me a job because they don't want me to stay home because their insurance was going to go out. That's what Mr. Fred Groome told me about the injury on my job. And I got proof of that right here on these papers. Do you want to see it? |
| REFEREE: | No he's not asking you for any proof. |
| Q. | You first injured yourself on the job by banging your knee or cutting you finger? |
| REFEREE: | Okay let's not stray into some kind of workman's comp injury issue. That's not why we're here. |
| Q. | Okay. Just on the issue of the company trying to keep you working, after you hurt your knee didn't you tell the company you couldn't keep doing your carpenter job? |
| A. | Yeah. |
| Q. | And didn't the company say ... |
| A. | That's what the doctor tell me. It was not said by me, the doctor's orders. |
| REFEREE: | Was the knee injury part of the discrimination complaint? |
| A. | No. |
| REFEREE: | We don't need to explore that. |
| Q. | All right. What I do want to ask you if I can you said that Fred Groome told you he would rather have you work than not work right because of the insurance cost is that what you said? |
| A. | Yeah. |
| Q. | Okay. So you understood he was trying to create a job that you could do isn't that right? |
| A. | On my ability to work I don't understand legal procedures about that. So he convinced me to because the doctor ordered to stay off work and he override the orders from the doctor. |
| Q. | He overrode the doctor's orders? |
| A. | Yeah. |

Page 35

Q.          That's not true now is it?

REFEREE:    Is this still on the injury?

Q.          Well it's just that we were trying to keep him at work and we certainly didn't override the doctor's orders.

REFEREE:    I don't think that's material for the issue he's contending he quit for.

(CHANGING OF TAPE)

REFEREE:    This is a further continuation of case number 5204-AT-00. We went off record to change the cassette. At the time Mr. Kruger was questioning Mr. Gonzolez. Anything happen while we were off the record changing the cassette?

ATTY:       No.

CLMT:       No.

REFEREE:    Let's move on to something besides the knee injury.

## CONTINUED EXAMINATION OF CLAIMANT

## QUESTIONS BY ATTORNEY:

Q.          Yes, sir. Mr. Gonzolez you were hired in the end of 1998 right?

A.          Yeah.

Q.          And then in April of '99 ... Just to get all this straight, which was after you hurt your knee, you went home to Mexico is that right?

A.          Yeah I asked for permission to go to Mexico.

Q.          Okay. And you asked to go to Mexico for a week and a half isn't that right?

A.          Yeah.

Q.          But you actually went and stayed away for a much longer time didn't you?

A.          Yeah I got sick after I got there. I got the chicken pox.

Q.          Okay.

A.          So I had to stay up there. I got proof some medical records.

Q.          In fact you didn't come back to work until, until June isn't that right or May?

A.          I can't recall exactly when.

Q.          I want to show you this and I'll turn in to the Hearing Officer.

REFEREE:    Again you're into an area that I don't see as a basis for his contention that he

Page 36

should be eligible for benefits.

Q.          Okay let me see.

REFEREE:    If there's something there involving discrimination of national origin let's see it but otherwise ...

Q.          Thank you.  There is.  There is Your Honor.  So you see this?

A.          No I didn't.

Q.          I'm sorry. Go ahead and see it.

REFEREE:    Go ahead and look at it.

Q.          And I'll ask the question about it.  Do you see the list of dates that you were absent, the weeks that you were absent?  See on there the list of the weeks that show how many weeks you were absent while you were staying in Mexico?

A.          Yeah.

Q.          Okay.  Even though you were only asked for a week or a week and a half off, but in fact you missed one, two, three, four, five, six, seven, eight different weeks.

A.          It's not related ...

Q.          Let me finish the question.

REFEREE:    Ask the question one more time but if you continue on that I'll indicate that that's not a path we can take here with this.

Q.          I understand.  What I want to ask you is even though you were out for eight weeks when you had only asked for one and a half, the company and Mr. Groome did not harass you about that performance issue, but instead they let you come back to work didn't they?

A.          I called and ... I called saying I was sick and that I was not available to work because of my sickness.  I was having chicken pox.  Till I get better that's when I come back.

REFEREE:    All he's asking you is you asked for a small period of time to be gone and it turned out to a long period of time.  Did the company harass you at all because you stayed out longer than you anticipated?

A.          No because of my injury to my knee. I believe (UNINTELLIGIBLE) They said they cannot fire me because of my injury.

REFEREE:    Did they harass you because you were gone to Mexico almost two months instead of a week and a half?

A.          Yeah. Yeah they mention it all the time. They say you don't appreciate it.

REFEREE:    That's harassment. They said you didn't appreciate it. They let you stay two months instead of a week and a half.

A.          They always keep telling me you don't appreciate it because you (UNINTELLIGIBLE) because I don't want to stay out. It's because I was sick.

REFEREE:    That's all they said was you don't appreciate the fact they let you stay two months instead of a week and a half which was your original request?

A.          Yeah.

REFEREE:    I don't consider that harassment if that's all it was.

Q.          I just wanted to make that Exhibit 1 if I could.

REFEREE:    I really don't want to put that in the record because I really don't think that's material to this issue that he's contending was the basis for why he should be entitled to benefits. We're delaying this quite a bit.

Q.          All right. Yes, sir. Um, Mr. Gonzolez the way that you wound up with the parking lot job ah, was because you needed to have a light duty job to work on isn't that right?

A.          Yeah.

Q.          And when the company was trying to create or make sure that you had a job to do so you could keep drawing a paycheck you struggled against them giving you that parking lot job didn't you? You kept making demands.

A.          What do you mean? I don't understand the question. I'm sorry.

Q.          Well didn't you tell them I can't guard the parking lot. I need to have a chair to sit in.

A.          No I never mentioned that.

Q.          And didn't they say we'll give you a chair to sit in?

A.          They never give me a chair.

Q.          Didn't you tell them I can't guard the parking lot because I don't have a water cooler out there?

A.          I never mentioned that.

Q.          And didn't they say well we'll give you a water cooler?

A.          They never put one.

Q.          Didn't they tell you they'd give you a portable toilet out there because you said you had to walk too far to go to the bathroom?

A.          Yeah they gave me one.

Q.          Didn't they tell you they'd give you an umbrella in case it started to rain and you could use the umbrella while you walked from the parking lot to the building?

A.          They never gave me one.

Q.          But you discussed all that right?

A.          No.

Q.          I'm going to show you this letter which is dated September 22nd, '99, and let you look at it and then I'm going to ask you questions about it. Do you recognize it?

A.          Yeah.

Q.          Okay. Do you want to read it or not?

(NO ANSWER AUDIBLE)

Q.          All right I'm going to offer this in Your Honor. Doesn't this ... And I guess I'd offer it as Exhibit 1 or A?

REFEREE:    A for the employer.

Q.          Okay.

REFEREE:    Employer Exhibit A is a copy of a one page memo on the Holder stationary. It's signed by Fred Groome, superintendent. 9/22/99. Below his signature is Cineo Gonzolez, 9/22/99. Let me pass it back to you to examine it for any comment, rebuttal or objection to the document.

A.          That's the day John Dade tried to hit because I signed this one. I don't

Page 39

|  | understand exactly what they were trying to say and I told him that before I sign this paper they have to prove all this stuff what they were saying right here it was true. You can see right here I rip it off. |
|---|---|
| REFEREE: | That black mark there is where part of the paper is ripped off. |
| A. | Ripped off. And I asked John Dade (UNINTELLIGIBLE) before I ever sign anything. And I do not understand what they were saying and that's when I ripped it off. That is the day he tried to hit me. That is the day. They never gave me an umbrella or anything on the parking lot. They did put a toilet for all employees on the parking lot. |
| Q. | Did I understand you to say you didn't understand what this paper said? |
| A. | No. This is where I ripped it off and I said this does no, that's not fair. You made me sign something that I don't understand and I ripped it out of his hand. |
| Q. | Well it says we're providing you with the following items and it lists, water cooler, toilet, chair and umbrella. You understand that don't you? |
| A. | No I don't understand exactly what they were saying. And I asked him ... |
| Q. | You don't understand that. |
| REFEREE: | Let him read it again. Can you read that document Mr. Gonzolez? |
| A. | On September 22, Cineo Gonzolez to his supervisor (UNINTELLIGIBLE) and (UNINTELLIGIBLE) anymore Holder Construction (UNINTELLIGIBLE) knee due to this incident, due to his high incidents (UNINTELLIGIBLE) and he need to direct employees away from (UNINTELLIGIBLE) trailer. We are relocating. You see that's relocating. I was already there when they made this letter. Mr. Gonzolez to the employee parking area to provide supervision. Mr. Gonzolez has been restricted to light duty work. He also must not be on his knee for at least half of his shift. We are providing Mr. Gonzolez with the following items: Water cooler, portable toilet, chair and umbrella. |
| REFEREE: | And that's what you ripped off the bottom corner? |
| A. | Yeah because they never provide that to me. And I said that's not fair for |

me to sign something that you are not doing. (UNINTELLIGIBLE) angry right now because I never (UNINTELLIGIBLE) what it was saying right here. This is why I ripped it off.

REFEREE:   Okay go ahead with your questions.

Q.   Didn't you sign that document?

A.   Yeah.

Q.   Didn't Mr. Dade bring it to you?

A.   Yeah and I voided it. You can pull right here. I put void.

Q.   Let me ask you this. Didn't Mr. Dade bring you that document after Mr. Groome signed it and he asked you to sign it?

A.   No I don't see him sign on top. I sign just mine.

Q.   Okay. All right. But you signed it and then you put it on the desk where Mr. Dade was didn't you?

A.   He put it like this and he said just sign right here. I said what is this. It's for water cooler, and chair and everything. And I signed it and then I said let me see it. And I started reading it and I said that's not true and that's when I ripped it off of his hands.

Q.   So you had signed it and he had it in his hands and you ripped it off right?

A.   I ripped it off yeah.

Q.   Okay. And ...

REFEREE:   We're falling back into the knee injury again.

Q.   Okay let me try to move on past that. So they had put you in this light duty job and had provided at least some of those things to you right?

A.   They never provide.

Q.   Some of those things.

A.   The toilet for all employees it was already there.

Q.   Okay. And you continued to work in that job for a good while until you quit right?

A.   I had to drive back and forth to use the water, to go get some water. Ah, ...

REFEREE:   The question he's asking you is did you continue working in that job until

Page 41

|  | the day you quit? |
|---|---|
| A. | Yeah. |
| REFEREE: | Is that the last job you had? |
| A. | Yeah. |
| Q. | Let me ask you this. Didn't you tell them you didn't want to sit in the chair. You wanted to drive your van and sit in the van while you guarded the parking lot? |
| A. | I said I never said I want to drive my van. I said I don't care how you put me. |
| Q. | Didn't you in fact decide that you would rather drive you van and sit in your own car while you guarded the parking lot? |
| A. | No I never told them I was going to drive my van. It was going to cost me money and they were not going to pay me for my gas. |
| Q. | Is that what you did though? Did you drive the van? |
| A. | I sit on my van because they never provide anything for me to sit. |
| Q. | All right. At some point you told them well I can't drive my van anymore didn't you? |
| A. | No I don't recall that. |
| Q. | Didn't you tell them I can't drive so you have to send a taxi to bring me to work? |
| A. | No that's from the doctor's nurses. We're going back to the same medical. |
| REFEREE: | This is still seems in part because of a knee injury and the attempts to put him back to work in a limited capacity until he was fully released to go back to work. I don't see that that's part of his allegation of discrimination by national origin. |
| Q. | The reason I wanted to offer. I don't have too much more on this. Is that it's completely inconsistent for him to be saying the company's harassing me on the one hand, when on the other hand he's throwing up roadblocks and trying to not work. He even goes so far as to say I can't come to work. You'll have to send a cab. And in fact the insurance company agrees to |

Page 42

provide him transportation and still he quits. So it's the opposite of harassment is the reason I want to get a little more into it.

REFEREE:    Well I don't by that argument because he's contending that there were one or more individuals that had a biased or prejudice against him because of national origin as a Mexican and harassed him on the job for that reason. And a knee injury I don't see how that occurred because of harassment because of national origin. And simply the company's attempt to bring him back to work gradually based upon the doctor's release and putting him in another position until he can perform his normal duties. I don't see how that's connected.

Q.    Okay let me see what else I can ask you. Well okay this is what I want to ask you. Um, you actually complained one time when you filed that formal complaint didn't you?

A.    Excuse me.

Q.    You complained to the company when you filed a formal complaint right?

A.    Before I make several complaints.

REFEREE:    I think you're talking about the formal one. You showed us a cover page for.

A.    Yeah.

REFEREE:    Back in August of '99.

A.    Yeah that's when I went to the office and talked to Fred Groome and I told him that enough is enough. I want something in writing. I want something that says I'm complaining because I'm tired. I just keep complaining (UNINTELLIGIBLE) and you guys don't do anything to stop this. That's when I said enough is enough.

Q.    Okay I'm going to hand you a copy and get another copy to hand him of this. This is going to be our exhibit 2.

REFEREE:    Okay this is what?

Q.    This is the formal complaint that was attached to that cover sheet that he had a while ago.

| | |
|---|---|
| REFEREE: | This is the one he didn't have a copy of himself. |
| Q. | That's right. And that's a copy that you can keep and I'll show him this one. |
| REFEREE: | I'll pass this one to him. We'll call this Employer Exhibit B. It's a copy of a two page document of a formal complaint on the company Holder stationary. Employee, Cineo Gonzolez. Date 7/30/99. Second page signed Fred Groome, 7/30/99, 11:30 a.m. Below it's handwritten carbon copies to three different areas. Okay I'll let you examine that for your comment, rebuttal or objection Mr. Gonzolez. |

(MOMENTARY PAUSE - LOOKING OVER DOCUMENT)

| | |
|---|---|
| A. | I never received one of these. |
| Q. | You say you never received that? |
| A. | No. |
| Q. | Okay. You did show us, and this is a copy of what you showed us before. |
| A. | Yeah that's what only they give me. |
| Q. | And that's a transmittal to you right? |
| A. | Yeah. |
| Q. | And you signed the one that you showed us before right? |
| A. | Yeah. |
| Q. | And it says in the middle of that that what they transmitted was a copy of a formal complaint doesn't it? |
| A. | Yeah. |
| REFEREE: | Did you ever see what was transmitted? |
| A. | No. |
| REFEREE: | This document? |
| A. | No. |
| REFEREE: | That's what he's saying. He was never shown what was transmitted. |
| Q. | Well let me ask you just about this document. I understand you never saw it before. Does it set forth the things that you complained about in your formal complaint? |
| A. | Complaint number one. Complaint number two I never ... Keep going with |

that lawyer. Then about ah, taking pictures of me (UNINTELLIGIBLE) the doctor gave me some pills for pain relief. I had to take those pills and I take on the job site. They made me sleepy and I fell asleep in a chair and John Dade who was taking pictures of me sleeping all the time.

REFEREE:    What are we getting in to now here with this?

A.          I don't know.

REFEREE:    What he's asking you is when you made this complaint to Mr. Groome to put something in the form of writing, are those the things that you mentioned to Mr. Groome that you were complaining about?

A.          Some not all.

REFEREE:    Which ones didn't you complain about?

A.          I complained mostly the way they write it.

REFEREE:    Okay but category wise are those the topics you complained about?

A.          Yeah.

REFEREE:    Next question.

Q.          Thank you. There's nothing in this formal complaint about discrimination is there or harassment?

A.          Yeah.

Q.          Because you're Mexican or anything like that. Is that in there anywhere?

A.          Excuse me.

Q.          Is there anything in there about national origin or Mexicans?

A.          I don't know because I never read the report.

REFEREE:    Well you're just looking at it. Did you see anything in there when you looked at it that referred to a complaint of discrimination because of national origin?

A.          They just put whatever they want to put.

REFEREE:    Okay. They put in there what they want, but when they put in there what they want did they mention anything about national origins or discrimination?

A.          No. There's nothing about discrimination here.

Page 45

REFEREE:   How much longer do you think you'll be doing cross examination because we haven't even switched over to your side. We may have to postpone this to finish?

Q.   I'll try to do just five more minutes on cross examination.

REFEREE:   Okay.

Q.   Okay. All right so now let me ask you this. The one thing you complained about was pictures being taken of you is that right?

A.   Right.

Q.   And I'll hand these two pictures to you. Those are pictures that were taken in July right?

A.   Yeah.

Q.   And those show you on the job right?

A.   Yeah.

Q.   And they show you reading a newspaper don't they?

A.   Yeah.

Q.   And that's what you were doing while you were supposed to be working right?

A.   I was supposed to be sitting on the chair.

Q.   You were supposed to be working right? Were you getting paid?

A.   Sitting on the chair.

Q.   Okay were you getting paid?

REFEREE:   Were you on the clock or was it a lunch period or break period?

A.   I was ... I cannot recall because I was sitting eight hours straight. I don't ... I was sitting on my chair eight hours straight.

REFEREE:   Were the pictures dated with time and date?

Q.   I don't think they have a time but they're dated 7/30/99. And is that the chair you sat on when you worked the job in the tool room?

A.   Yeah.

Q.   Okay. So you certainly could have been working or on the clock at the time?

A.      The job for me they told me just sitting down job.

Q.      Okay. Ah, ...

A.      There was nothing I could do.

Q.      All right. Jonathan Sprite, when you were performing your job at the parking lot as a guard how ... Was Jonathan Sprite a supervisor of you in that capacity?

A.      On the parking lot?

Q.      Right.

A.      Watching the cars?

Q.      Yes. He didn't work in the parking lot did he?

A.      No.

Q.      Okay. So you didn't have much to do with Jonathan Sprite while you were doing the parking lot job right?

A.      No.

Q.      All right. And the last complaint you made about Jonathan Sprite was with regard to the cartoon and that was back in January of '99 right?

A.      Yeah.

Q.      Okay. So that was a year and a quarter before you quit right?

(NO ANSWER AUDIBLE)

Q.      That's all right. Johnny Stewart. He's a man you complained about but he, you testified, left employment there more than six months before you quit right?

A.      Yeah.

Q.      So he was not harassing you while you were performing the parking lot job was he?

A.      No.

Q.      All right. And then Mr. Dade is the last person you complained about?

A.      Yeah.

Q.      But you didn't say anything during all your testimony about Mr. Dade every making any racial comment did you?

| | |
|---|---|
| A. | Huh. |
| Q. | Is that correct? |
| A. | Racial comment? |
| Q. | Yeah, any comment about your national origin? |
| A. | He mentioned it several times. I don't say it right here. |
| Q. | Okay. You haven't said that till just now have you? |
| A. | Yeah. |
| Q. | All right. But the fact is the ah, when you were performing your parking lot job you were away from Mr. Dade too weren't you? |
| A. | He was once in a while in the parking lot. |
| Q. | So once in a while you might see him? |
| A. | Yeah. |
| Q. | Okay. So all the people that you complained about harassing you ah, really had hardly anything to do with you while you were performing your parking lot job did they? |
| A. | When I go and sign in and sign out I have to see them there. |
| Q. | Okay. But that would be all? |
| A. | Pretty much. |
| Q. | Okay. All right I just got one more document to show you. This is a letter dated March 15th. And I got a copy for the Hearing Officer and a copy for you. That's the letter that Mr. Eastman wrote you isn't it? |
| A. | (UNINTELLIGIBLE) |
| REFEREE: | Here let me get it in the record for you. |
| Q. | Thanks. |
| REFEREE: | We'll mark this is Employer Exhibit, I believe this is C. |
| Q. | I believe that's right. |
| REFEREE: | And it's a one page letter on the company stationary dated March 20th, 2000, addressed to Mr. Cineo Gonzolez regarding your current security position at Federal Reserve Bank of Atlanta, Birmingham branch project. Signed Chris Eastman, Senior Project Manager. Okay do you want to |

examine that for your comment, rebuttal or objection?

A.       Yeah.  Yeah I received this letter in the mail.

REFEREE:    Okay let's see if he has any questions to ask you about it.  Hold on to it a minute.

Q.       Sir I want to ask you when you got this letter you understood that Mr. Eastman was telling you that he needed you to work as a security guard and he was telling you that he had tried to accommodate you.  And he asked you to continue to report to work wearing the proper job attire isn't that right?

A.       That's what the letter says.

Q.       Okay.  So clearly Mr. Eastman was telling you he had a job for you if you would keep working at it wasn't he?

A.       I already quit when I received this letter.

Q.       Okay.  Um, the reason you quit is because you don't want to work, because you think you feel better when you don't work?

A.       Like I said I was making $16 an hour.  I was not doing anything.  I was making pretty good money.  I mean I don't want to stay off work.

Q.       Do you remember seeing a therapist Stacy, it looks like it's Goggins?  Do you remember seeing a physical therapist named Stacy Goggins?

A.       I don't recall.

Q.       You saw a lot of therapist and doctors and things.

A.       Yeah.

Q.       Ms. Goggins notes ... I'll give you this so you can look at it.  Right there the first line.  "Patient states his pain goes down when he doesn't have to work."  Is that what you told the doctors?

A.       No.

Q.       The doctor just made that up?

A.       Made that up.

Q.       You see this piece of paper?

A.       Uh, huh.

Q.       Do you see the bottom of it?

| | |
|---|---|
| A. | I got a copy of it. |
| Q. | You got a copy of that.  So where did you get a copy of that? |
| A. | From them.  From the office. |
| Q. | The doctor's office or the therapist's office? |
| A. | No.  The therapist's office. |
| Q. | Okay.  So this paper that you've got a copy of as well at the bottom is signed by a Stacy Goggins who's a physical therapist right? |
| A. | Yeah. |
| Q. | And at the top of it the first thing she wrote was that you told her you felt better or that your pain went down when you didn't have to work right? |
| A. | I never said that. |
| Q. | Okay.  And so your testimony is then that paper that you've got and the company has in its files and this medical person wrote is just a lie that she made up for some reason? |
| A. | I got a tape recording where they told me about the company telling the physical therapist to push me to the limits one time, one physical therapist. I got a letter right here that ... |
| REFEREE: | Again we keep trying to stray back to the workmen's compensation issue. |
| Q. | Okay. |
| REFEREE: | If this is going to ... |
| ATTY: | I think I'm done. |
| REFEREE: | (UNINTELLIGIBLE) the situation we're going to have to postpone because I've got other decisions to work on here even though this is the last hearing this afternoon. |
| ATTY: | I think that's all the questions that I have Mr. Hearing Officer. |
| REFEREE: | All right.  Go ahead and develop your witness's testimony and offer any evidence you have to support it but like I said if we get too far we're going to have to continue to some other time. |
| ATTY: | We'll try to move along. |

## EXAMINATION OF WITNESS

## QUESTIONS BY ATTORNEY:

Q.     Mr. Groome tell the Hearing Officer what your name is and what your job is.

A.     Fred McEver (sic) Groome, III, Project Superintendent, Federal Reserve, Birmingham, Alabama.

Q.     And were you on this project when Mr. Gonzolez got hired?

A.     Yes, sir.

Q.     All right. And you were personally aware of his job situation through the injuries and time off in Mexico and the assignment to the parking lot job and up until the time he quit?

A.     Yes, sir I was directly involved in all the decisions and process procedures that went along with it.

Q.     Okay. And you also heard Mr. Gonzolez testify that on some times he had complained to you about various people?

A.     Yes, sir.

Q.     Ah, one of these exhibits is a formal complaint and it's Exhibit B. Did you, did you sign that on the second page?

A.     Yes, sir.

Q.     And can you verify for the Hearing Officer that that's an accurate reflection of what was discussed during the formal complaint with Mr. Gonzolez?

A.     That's my considered opinion of what was discussed over a 20 to 25 minute period of time between Mr. Gonzolez and I. And in addition to that I had Mr. Chris Eastman come in after we had the conversation and we discussed it as a group, each and every issue and then we signed off on it, made a letter to the file to insure that we had proper documentation.

Q.     Was it your understanding at the end of that formal complaint meeting back in July of '99 that Mr. Gonzolez was satisfied with everything being taken care of?

A.     You know I felt like he was, but that was the first time that he ever really

unloaded all his problems and issues on me so I didn't really know.  But I told him I would look in to ever issue.

Q.   Ah, with regard to the ah, placement of Mr. Gonzolez in the parking lot job, ah, would you just explain briefly what was that about?  Why did he get that job and what was the company's intention?

A.   We had some general theft out in the parking lot and we needed someone and would probably have had to hire a security guard and we looked at that as being the best case scenario with his issues with other employees for Holder Construction and in relationship to the needs of the project.

Q.   Okay.

A.   So there were two issues and we  tried to resolve both with making that decision.

Q.   And was a part of that to try to provide Mr. Gonzolez with work that he was able to do?

A.   Yes.

Q.   Okay.  Ah, in terms of Mr. Gonzolez told us during his testimony that he had complained about a couple of people such as Mr. Stewart who was on the gate I guess, and Mr. Sprite, and a Mr. Gordon.  And I believe he told us every time he came to you that you took care of the problem.  Do you recall any of that or can you offer anything on that?

A.   The ... Really the issue with Gordon I don't necessarily recall.  The issue with Johnny Stewart was apparent to everyone in the company.  We had a bad problem with people coming in after 7 o'clock.  And what happened was anybody that came in after 7 he was either sending them back home or making them sit out in the parking lot and losing an hours time.  He come from the old school.  Cineo did mention that to me and I told him that he came up and he had to work hard to get where he is, and there were several employees on the job that were coming in 15 to 20 minutes late.

Q.   With regard to that particular complaint of Mr. Gonzolez that you talked with Mr. Stewart about you understood that what Stewart was doing was

|         | trying to stop people from coming in late by penalizing them? |
| A. | That was the biggest issue yes. |
| Q. | All right. And was that effective? |
| A. | It was effective. |
| REFEREE: | Do you have a question? |
| CLMT: | Yeah. |
| REFEREE: | What's your question? |
| CLMT: | That ... |
| REFEREE: | To me. |
| CLMT: | Oh, I was going to ask if he never sent me home or ... |
| REFEREE: | Okay you have a question for the witness? |
| CLMT: | Yeah. |
| REFEREE: | Okay you can't ask that until he finishes questioning then you can ask your questions. Hold them till later. |
| CLMT: | Oh. |
| Q. | Okay. During this discussion that's reflected in the formal complaint did Mr. Gonzolez ever claim to you at that time that Mr. Stewart had said derogatory comments? |
| A. | He did mention in the complaint that Mr. Stewart had some issues with him and other Mexicans. |
| Q. | Did you speak with Mr. Stewart about that? |
| A. | Most definitely. |
| Q. | And told him that was against the company policy? |
| A. | Yes I did. |
| Q. | Okay. And to your knowledge did that resolve itself and not occur again? |
| A. | To my knowledge it did not occur ever again. You know, in my position I'm not out there right in the middle of everybody at all times. I thought we had taken care of it. And his comment when I talked to Johnny was that he didn't even ever have to talk to the guy again. |
| Q. | Okay. |

A.        He was upset that Cineo had made the statements and he told me it was a lie.

Q.        All right.

A.        Now he, in other words, it was never admitted by a Holder foreman or superintendent that that ever took place.  It was Cineo Gonzolez complaining to Fred Groome.  It was never verified by the party that was accused.

Q.        Right. I understand. But nonetheless when you got a complaint about it, as a Holder management person, you went to the person who was being complained against?

A.        Correct.

Q.        And told them don't break our policy?

A.        That's right.

Q.        Okay.  Ah, all right.  Now tell me if you would ah, ... Well I'll tell you before that.  Let me hand you this document and ask you if you recognize it and then I'm going to hand that in as an Exhibit.

REFEREE:.    Now that's an extensive document.  It's going to take a lot of time for Mr. Gonzolez to read that before we can proceed.  What is it?

Q.        Well what it is he's made these complaints about discrimination to the EEOC and the company's responded and I think that's probably the best fastest way to put in the record what the company's responses are.  I'm not going to go through it.  I just want to ask him if that's the company's response.

REFEREE:    But if you put it in the record he has to have time to examine it and it's going to be an extensive period of time for him to read it so at that point I'm going to postpone the hearing or continue it because he will not be able to read that and have any understanding of it in a matter of five minutes.

Q.        Let me not ask you about that for the time being.  Maybe we can avoid that.

REFEREE:    I mean I can ask the parties can you stipulate that Mr. Gonzolez has made a complaint and can you stipulate that it's still pending, there's been no

decision regarding his EEOC.  Is that the case at this point?

A.          That's the case.

CLMT:       Yeah.

REFEREE:    You filed a complaint but the EEOC has not made a decision yet it's still
            pending?

CLMT:       Right I don't receive any letter or anything from the EEOC.

Q.          Let me just ask you three or four questions about this.  Does Holder have
            a no harassment policy that it publishes?

A.          They do to salaried associates ...

Q.          Okay.

A.          ... who are in the management positions throughout the company.

Q.          And it says that they don't tolerate harassment right?

A.          That's exactly right.

Q.          And that's the kind of thing you would have reiterated with anybody that
            you talked to in this case?

A.          Yes.

Q.          Okay.  Tell the Hearing Officer about this letter that is Exhibit C if you
            would, the March 20 letter where Mr. Eastman wrote and told Mr. Gonzolez
            that his job in the parking lot was there.

A.          Okay.  Cineo came in to work on or about I guess a week prior to this letter
            and we had discussed with him that we wanted him to go back to the
            parking lot which was a couple of months later than the previous time he
            had spent in the parking lot.  This was, as Cineo stated earlier, about the
            time  he quit.  We just wanted him to understand that we had a job open for
            him.  Standard security job, parking lot.

Q.          In terms of the facts of Mr. Gonzolez quitting, ah, did you speak with him
            the last day or the day before his last day of employment about his job?

A.          Chris and I spoke with him out in the parking lot and I don't know if it was
            a week prior to quitting, two or three days prior to quitting.

Q.          What was the substance of that discussion?

Page 55

A.     The substance of that discussion was his duties in the parking lot.

Q.     And did Mr. Gonzolez indicate any reluctance to keep working in the parking lot during the discussion?

A.     Not really. I mean I thought it was a fairly decent discussion. I didn't see any indication that he didn't. I mean he had some complaints but I don't think he really registered his complaints to us. I thought it was all right.

Q.     All right. In terms of ah, any harassment possibly occurring to Mr. Gonzolez while he's out there in the parking lot, do you have any knowledge during this last month or two or three of his employment that there would be anybody out there in the parking lot harassing him?

A.     No. All of Holder's ... All of Holder's employees that were spoken of in the previous complaints were definitely told, but no other employees on the project that I know of ever had harassed Cineo. So I didn't see any harm out in the parking lot. Ah, my intentions were for the good of the project.

Q.     All right. After the day came ... By the way the last day that Mr. Gonzolez worked was March 17th?

A.     Yes. I think it was March 17th. I'm pretty sure.

Q.     All right. Do you recall maybe we were checking some records before we left and it was about that date?

A.     Yes.

Q.     After that date um, and he didn't come back the following work day did you know whether he had quit or not?

A.     No.

Q.     Um, and he didn't come back for the following, but he didn't come back during that next week, did you know whether he had quit or not?

A.     I still to this day am very unclear on what happened.

Q.     Okay. I want to show you one last document, which is a fax to Chris Eastman from the insurance company, St. Paul. And I want to direct you to the attention where the arrow is, where it says ah, talking about Mr. Gonzolez. It says also states that he has not shown up for work because he

|  | quit. Do you see that? |
| --- | --- |
| A. | Yes. |
| Q. | And are you aware of how the company came to have this document? |
| A. | Um, I'm a little unclear but St. Paul is our insurance company. Our insurance company is provided through the owner which is a Federal Reserve so there is no real direct relationship other than a little minor administration between out safety director that appears that was our first indication of anything historical to happen to Cineo since he left the company. |
| Q. | Okay. So you heard Mr. Gonzolez testify earlier that he called back once and he didn't say anything other than to ask for his check. So we hadn't heard from him except for that, from March 17th until this day which is April 24, the day of this fax. And then when you got this fax, the document that the insurance company sent to Mr. Eastman where it says he quit right? |
| A. | That's my first time seeing it but yes, sir. |
| Q. | I wanted to offer this. |
| REFEREE: | That particular point is undisputed. |
| Q. | Okay. |
| REFEREE: | He says he quit and he says he quit without notice. |
| Q. | We've proved that. |
| REFEREE: | It is undisputed. |
| A. | Okay. Um, I would like to close with some of the things that were never really stated and I know clearly before you didn't want to bring worker's comp versus harassment together but I would like to as Fred Groome, superintendent of the Federal Reserve to let everyone in this room understand that there are issues that are directly involved with both cases. |
| REFEREE: | Well I've already ruled that I'm not going to let that part in. |
| A. | I just want to close ... |
| REFEREE: | This isn't closing yet because Mr. Gonzolez has a chance to ask you questions then we go to summary statements from each side. |

A.          Okay.

Q.          Let me just ask him one more question if I can.

A.          I'm not even ... He's not wanting to put this together I'm not worried about it.

(MOMENTARY PAUSE)

ATTY:       Your Honor I think I'm done.  Could I have about a minute to step outside and talk with the witness to see if I got anything else I need to ask him?

REFEREE:    I'd rather you just whisper it in here because I'm not sure Mr. Gonzolez would understand what we're doing if we do that.  I don't want any clouds or anything.

ATTY:       That's okay.  That's fine.

(MOMENTARY PAUSE)

ATTY:       I'm done with the questions Your Honor and I'll have a statement after he has a statement or whenever you want me to have one.

REFEREE:    Okay.  Mr. Gonzolez this is your time to ask ... Is it Mr. Groome?

WITNESS:    Yes, sir.

REFEREE:    ... Mr. Groome your questions.  Go ahead and ask him your question Mr. Gonzolez.

CLMT:       I don't have any questions for him.

REFEREE:    All right.  I'll let each party summarize.  The party that files the appeal goes last.  Mr. Kruger go ahead and summarize for the company.

ATTY:       Thank you sir.  Um, the company's position here is that clearly the claimant quit as he has admitted.  On the issue of would there be any good reason for him to quit, obviously the company's position is no there wouldn't be.  The company bent over backwards to try to put him in a job where he could work.  And you know again not to (UNINTELLIGIBLE) but there was some issue about what jobs was he able to do.  And so the company thought let's don't have a man sitting at home and not working.  And frankly if he was drawing comp insurance it would be less than he could make so let's give the man a job that he can do.

Page 58

(CHANGING OF TAPE)

REFEREE:   All right this is a further continuation of case number 5204-AT-00. We went off record to reverse the cassette. At the time Mr. Kruger was giving a summary overall for the company. Did anything happen while we were off the record reversing the cassette?

CLMT:   No.

ATTY:   No, sir.

REFEREE:   Mr. Kruger go ahead continue.

ATTY:   But aside from that, aside from saying here the company clearly was trying to provide a job for this man. I want to focus a little bit on what equal opportunity law is. Um, my understanding of the Law in the equal opportunity area, which is where I practice and have for quite a few years, is that under that Law for a person to quit and have a claim against the company, they call it constructive discharge. I'm sure you're aware of that. And the Law says the job conditions or the alleged hostile environment has to be so intolerable that no reasonable person could be expected to keep their job under those conditions. Um, clearly that was not the case with Mr. Gonzolez and the job that he had. We heard his testimony about what complaints he wanted to make about alleged harassment. And they amount to a cartoon that's unfavorable, but which in his own words was months and months before he ever quit. If it was January '99, which I'm sure he said at one point, that would be a year and three months before he quit. Obviously that wouldn't be enough to make someone quit. And I will tell you that I know there are law cases where they say one thing like that, even if it's a cartoon or that kind of thing, is not enough to justify somebody quitting their job. The other thing he said was this man who was checking them in at the gate supposedly made a comment. But again that man left the job. That was Stewart. He left the job and went to another project back in August. So again that's six months before he quit his parking lot job. Clearly the fact that somebody six months ago, while he shouldn't do it if

he didn't it shouldn't make a comment like that. But a comment six months ago does not justify somebody quitting, and even add those two little things together. Again not to excuse them if you take them as true, but simply to say that doesn't justify a quit in the State of Alabama where you want to have people employed gainfully. And then the last thing really that he complained about I want to submit to you has some bearing on Mr. Gonzolez's credibility. Ah, taking what he admitted as opposed to what I asked. We know that he was sitting in a chair up against a wall reading a magazine, and there were some books up here. We know that the man who was the safety supervisor tried to get a book and then we know from his testimony that all he knows is a book hit him on the head. Frankly for him to say that the safety supervisor walks up to him and takes a book and hits him on the head when obviously he didn't see that is indicative of what you've got to view his testimony through. Mr. Gonzolez respectfully is trying to make a case. He's been trying to make cases for more than a year with the company. But that's a particularly a piece of testimony that I would submit as not credible. Compounded by the fact that then he waits a month or so, because this supposedly happened in January, and then he waits a month or so and calls it assault and files a report with the police. That again ah, and even when we read the little accident report that Mr. Gonzolez read to us, there's nothing at all to suggest that there was any intentional anything done with regard to the book falling on his head. On the other hand Mr. Gonzolez's testimony is that he still believed that he blacked out and he still has these spells or whatever. Um, and you know, while we don't litigate that comp situation here today I just want to say on the face of it we submit ... I can't hardly believe that. That he'd say a notebook hit me on the head and I got all these results from it. So we would ask you to consider the total story and in particular that part of the story about what Mr. Gonzolez is saying in ruling upon his appeal. And I guess we'd ask you to particularly focus on the fact that he knew what he was doing. He walked off that job.

He knew he could have come back to work and still had a job.  He knew that whenever he'd been to Mr. Groome in the past about somebody doing something that you might consider harassment, Mr. Groome had done something about it.  And then finally from his own testimony he admits that since he'd been on that job for the past six months or so he didn't hardly have any contact with anybody who he claims harassed him.  So while he may have a harassment claim he wants to make with the EEOC and they can decide that, in terms of what we would ask you to decide it is given that whole story is he justified in walking off the job and saying I'd rather have unemployment, or to the contrary shouldn't he be disqualified as he has been because a reasonable person should have stayed on that job.  The testimony is that there was no real harassment on that parking lot job.  And if there was he knew he had somebody he could go to who had taken care of it in the past.  And that the company's policy was against harassment.  So we'd ask you to affirm the disqualification.

REFEREE:      Okay Mr. Gonzolez do you have a brief summary you'd like to make overall?

CLMT:      Yeah I just want to say why I quit.  Why I quit he never mentioned it.  I left because I was feeling that my life was dangerous because of the hostile environment on the job about John Dade pointing his finger at me like he was holding a gun.  And previous times he tried to hit me once when I read the paper.  Then he hit me on the head then he tried with his fingers like he was pointing a gun.  This is why I spoke to my lawyers and they said if you cannot handle it no more just walk out.  So that's what I did.  I don't want to leave the job because it was a good job, paid well, and it's hard to find that kind of job.  Because it was my life and that's what I have to protect.  And you see I don't apply for this employment.   I was applying (UNINTELLIGIBLE) · that's when I start working back again. (UNINTELLIGIBLE) the harassment.  I'm looking for work I can hardly find work because my injury.  I tried to find one.  (UNINTELLIGIBLE)

that's when I get off from here.  And that's important that my life was in danger.  That's why I left the job.

REFEREE:    Let me see if we've got your address verified.  Yep. Okay if there's nothing else now the hearing's adjourned.  Each party will be mailed a decision in a week or two and each party can appeal to the Board of Appeals, the next step in the appeal process.  Thanks for appearing this afternoon.  Have a good day.

- HEARING ADJOURNED -

I, Michelle Reeves, Administrative Support Assistant II, hereby certify that the above and foregoing transcription was transcribed by me from a tape recording made at the hearing of this appeal before the Administrative Hearing Officer, and that said tape recording has been in the continuous custody of the Department of Industrial Relations, and the foregoing represents a true and correct copy of the testimony to the best of my knowledge and ability.

Michelle Reeves, Administrative Support Assistant II
Department of Industrial Relations
State of Alabama

September 7, 2000



**HOLDER**

# FORMAL COMPLAINT

**Employee:**  <u>Cineo Gonzales</u>
**Date:**  <u>7/30/99</u>

**COMPLAINT #1**

After returning from Mexico, Cineo complained about not getting enough hours. Cineo was put on 40 hours. Cineo complained to Johnny Stewart about other employees receiving more than 40 hours. Johnny Stewart advised Cineo "if he didn't like the hours, go get another job."

After talking with Cineo, he was given odd safety assignments to get over time. The issue about hours was settled and not brought up again until now. Johnny has not talked with Cineo since the incident.

**COMPLAINT #2**

Danny Lawyer has made comments in passing about Cineo's "Easy Money." He told Cineo to "get up, you need to work, not sit." Cineo stated that he took care of this problem with Danny Lawyer and there were no new issues.

**COMPLAINT #3**

John Dade has taken pictures of Cineo sitting and reading newspaper on the company's time. Cineo feels that John Dade is specifically picking on him by taking these pictures. Cineo said, "He took my picture and ran down the hallway." It was noted that it is John Dade's responsibility to take pictures. Cineo made the statement that harassment was illegal in the United States of America.

In conclusion, I asked Chris Eastman to review and witness formal complaint prior to printing.

**RESPONSE #1**

Chris and I responded by saying that Holder has no obligation to work Cineo more than 40 hours in complaint #1.

I reminded Cineo that he was absent for 5 1/2 weeks and still had a job. Furthermore, Holder Construction has been very accommodating to Cineo's injury status and Cineo has always had the opportunity to work 40 hours minimum.

**RESPONSE #2**

Chris and I responded that Danny Lawyer is a Holder Foreman and he gets paid to insure production standards are met.

**RESPONSE #3**

Chris and I commented that John Dade takes pictures daily as part of his job responsibility.

I stated that all parties concerned would talk and take care of any problems to a satisfactory condition.

# HOLDER CONSTRUCTION COMPANY

FEDERAL RESERVE BANK OF ATLANTA - BIRMINGHAM BRANCH

Cineo asked for a fan in the tool room. Chris and I agreed.

Cineo stated that he needed to rest his knee at times. Chris and I agreed.

Cineo stated that his main concern was getting better. Chris and I agreed that is the real issue at hand.

Job assignments were given to Cinco to take full charge of all equipment, maintain inventory and insure all equipment is operated properly and returned at the end of each day by Holder employees.

No further issues were discussed and all parties were satisfied at the conclusion of the meeting.

_Fred Groome_   7/30/99   11:30 A.M.

Holder Construction Company
Fred Groome, Superintendent

7/30/99 - 11:35 AM

CC: Dave Diffara - hc
Drew Yanfis - hc
Cinco Gonzalez   File

FEB. 2.2000   8:42PM   HOL   CONSTRUCTION LIBERTY PARK                NO.799   P.4

* * *. COMMUNICATION RESULT REPORT ( AUG. 2.1999   4@PM ) * * *

TTI  HOLDER CONSTRUCTION LIBERTY PARK

| FILE MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
|---|---|---|---|---|
| 307  MEMORY TX | | 17709883265 | OK | P. 3/3 |

---

REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL      E-2) BUSY
  E-3) NO ANSWER            E-4) NO FACSIMILE CONNECTION



**HOLDER**

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| **TO:** Drew Yantis – Vice President | **FROM:** Chris Eastman – Senior Project Manager |
| **COMPANY:** Holder Construction Company | **DATE:** 08/02/99 |
| **FAX NUMBER:** 770.988.3265 | **TOTAL NO. OF PAGES INCLUDING COVER:** 3 |
| **PHONE NUMBER:** 770.988.3264 | **SENDER'S REFERENCE NUMBER:** |
| **RE:** Cineo Gonzalez | **YOUR REFERENCE NUMBER:** |

☐ URGENT   ☑ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Drew / Dave – FYI – this shall recap our discussion with Cineo Gonzalez on Friday. All issues were resolved. As a side note, Cineo stated later in the afternoon that his knee was swelling up and hurt badly and he needed to be taken to Dr. Hill. Dr. Hill ... and that he needed to be taken to the Emergency

FEB. 2.2000   8:42PM   HOL? CONSTPUCTION LIBERTY PARK                    NO.799   P.5

# HOLDER CONSTRUCTION COMPANY
## FEDERAL RESERVE BANK OF ATLANTA - BIRMINGHAM BRANCH
### 524 Liberty Parkway / Birmingham. Alabama 35242
### (205) 298-1300 / Fax (205) 298-1336

**HOLDER**

TO: *CINEO GONZALES*

DATE *8·5·99*

JOB/NO: *9805*

LOCATION: *FRBA - B'HAM*

RE: *FORMAL COMPLAINT*

WE TRANSMIT TO YOU   ( ✓ ) HEREWITH          THE FOLLOWING DRAWINGS PREPARED BY:
                     (   ) UNDER SEPARATE COVER

| DRG. NO. | COPIES NO EACH | DESCRIPTION | REMARKS |
|---|---|---|---|
| | *1 copy of* | *FORMAL Complaint* | |

THE ABOVE PRINTS ARE SUBMITTED TO YOU FOR:

( ) YOUR APPROVAL          ( ) CORRECTION AND RESUBMISSION     ( ✓ ) YOUR FILES
( ) FINAL APPROVAL         ( ) ESTABLISHING DIMENSIONS         ( ) ESTIMATE ON
( ) FIELD USE              ( ) DIMENSIONS AS NOTED             ( ) FIELD CHECK
( ) FABRICATION            ( ) YOUR REVIEW AND COMMENT         ( ) YOUR USE

COPY TRANSMITTAL TO: _____   COPY DRAWINGS TO: _____

COMMENTS _____

FORWARDED BY:                          YOURS VERY TRULY,

( ✓ ) PICKUP       ( ) AIR MAIL        **HOLDER CONSTRUCTION COMPANY**
( ) MESSENGER      ( ) AIR EXPRESS
( ) OVERNIGHT DEL. ( ) FIRST CLASS MAIL   BY: *Ruth E. Sellars*



**HOLDER**

March 20, 2000

Mr. Cineo Gonzalez
P.O. Box 143
Jemison, AL   35085

RE:     **Your Current Security Position**
        **Federal Reserve Bank of Atlanta – Birmingham Branch Project**

Dear Cineo,

On March 15, 2000, Fred Groome and I spoke to you regarding whether you will continue working in the security position you have held since September 22, 1999.  The purpose of this letter is to confirm our unconditional offer to continue employing you in that security position, with no changes in your schedule, pay, benefits, or other terms and conditions of employment.

As we discussed, we have an immediate need for a security guard in our south parking lot.  Although an essential function of that job is to be present in that lot, we did offer to make numerous accommodations to enable you to perform that job.  Among other things, we offered to provide you a chair, umbrella, water keg and portable bathroom.  We also offered you the flexibility to choose whether to sit or walk around and to select the location of your chair on the lot.  In the case of inclement weather, we discussed that you may report to the building project across the street.

Over the past year or so, we have demonstrated our willingness to work with and to accommodate you.  In this situation, we have continued to be flexible in working with you.  We will consider making any other reasonable accommodations to enable you to perform the essential functions of this job (i.e. allowing you to utilize your own vehicle in your duty).

As in the past, you should continue to report to work with the proper attire – hard hat, work boots, long pants, sleeved shirt and safety glasses.

Sincerely,

Chris Eastman
Senior Project Manager

cc:     Dave O'Haren
        Lee Johnston
        File

**HOLDER CONSTRUCTION COMPANY**
FEDERAL RESERVE BANK of ATLANTA · BIRMINGHAM BRANCH
524 Liberty Parkway / Birmingham, Alabama 35242 / (205) 298-1300 / Fax (205) 298-1336